USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-2-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAMIEN JOHNSON,

      Petitioner,

- against -

ROBERT CUNNINGHAM,

      Respondent.

REPORT AND
RECOMMENDATION

09 Civ. 7491 (JSR) (RLE)

---

**To the HONORABLE JED S. RAKOFF U.S.D.J.:**

## I. INTRODUCTION

*Pro Se* Petitioner Damien Johnson, a New York state prisoner at Greenhaven Correctional Facility, seeks a writ of habeas corpus pursuant to 28 U.S.C. §§ 2252 and 2254. His Petition was filed with the *Pro Se* Office in this District on August 27, 2009.

Johnson was convicted of murder in the second degree (N.Y. Penal Law § 125.25[1]), criminal facilitation in the second degree (N.Y. Penal Law § 115.05), criminal possession of a weapon in the second degree (Former N.Y. Penal Law § 265.03[2] [amended eff. Dec. 21, 2005]), and criminal possession of a weapon in the third degree (Former N.Y. Penal Law § 265.02[4] [repealed eff. Nov. 1, 2006]). He was sentenced to an indeterminate term of thirty years to life imprisonment, consisting of a prison term of twenty-five years to life on the murder charge, and a consecutive five-year term on the second-degree weapons possession charge. He also received concurrent prison sentences of five to fifteen years for the criminal facilitation charge, and seven years for the third-degree weapons possession charge. A five-year term of post-release supervision was also imposed.

Johnson contends that his incarceration violates the United States Constitution in that: (1) the trial court, in violation of his Fifth and Fourteenth Amendment rights, erroneously precluded the defense from calling a witness who claimed to have heard the chief prosecution witness admit to having testified falsely against Johnson to obtain leniency under a cooperation agreement; and (2) because Johnson had no prior history of violence, his twenty-five-to-life sentence for the murder conviction should have been reduced as being harsh, excessive, severe, and constituting cruel and inhuman punishment in violation of his Eighth Amendment rights, and, that his consecutive sentence for the second-degree weapon possession conviction should be modified to run concurrently. (Johnson's Pet. under 28 U.S.C. § 2252 and § 2254 ("Pet.") ¶ 2.) For the reasons set forth below, I recommend that the Petition be **DENIED**.

## I. BACKGROUND

### A. Factual Background

#### 1. The Crime

Antoine Clemmons, Eddie Cruz, Guy Jones, and Johnson were involved in the sale of crack-cocaine in Upper Manhattan. (Tr. at 425.) Shortly after midnight on March 2, 2002, Jones and Bryant Mitchell argued over the right to sell drugs at the Martin Luther King Towers housing projects. (Tr. at 555-59.) At approximately 12:35 a.m., Clemmons received a phone call from Jones, who indicated that he had a problem with someone. On instructions from Jones (Tr. at 428-30), Clemmons called Johnson, and he, Johnson, Cruz, and a younger individual, "little Brandon," drove together in a livery cab to see Jones. (Tr. at 396-403, 428-433, 660-61, 736-37, 742-45.) Johnson had asked Clemmons to bring a gun, and he passed it to Johnson before entering the cab. (Tr. at 438, 660, 663.) According to Clemmons, Johnson asked Clemmons whether he was going to "put it in," meaning "use the gun." (Tr. at 431.) Clemmons declined,

2

saying that he was not "ready for that," (Tr. at 431-32, 495), and Johnson kept the gun. (Tr. at 432.)

When the cab arrived at the Martin Luther King Towers just after 1:00 a.m., Johnson, Clemmons, and Cruz found Jones, and the four of them walked to a nearby building in search of Mitchell. (Tr. at 433-35, 661.) Jones's girlfriend at the time of the shooting, Latanya Dewitt, was also outside of the building that evening. (Tr. at 555-56, 564-66, 582-83.) The four men went into the building in search of Mitchell. (Tr. at 434.) Clemmons testified that inside the building, Jones said he would "knock on the door," and Johnson replied, "If you knock on the door, I'm going to shoot him right there." (*Id.*) Clemmons and Johnson testified that Johnson passed the gun to Cruz before leaving the building. (Tr. at 437-38, 661.) The men did not find Mitchell inside the building. (Tr. at 436-37; 563-67.)

After Mitchell had been identified by someone outside the building, (Tr. at 438), Jones, Johnson, and Cruz, spoke with him (Tr. at 438, 452, 458) while Clemmons acted as a lookout for the police. (Tr. at 439-40.) From twenty feet away, Dewitt heard Mitchell arguing loudly with Jones and declaring that he was "ready to die." (Tr. at 560-69.) Jones left the group, and while walking past Clemmons, said "They're about to do them." (Tr. at 441-42.) Johnson said to Mitchell, "Your life over" (Tr. at 442), and then pulled out the gun. (Tr. at 569-70, 600, 603-04.) Clemmons testified that he saw a flash and heard a gunshot from "the direction of" Cruz. (Tr. at 442-45.) Johnson, Cruz, Jones, and Clemmons fled the scene. (Tr. at 442-45.) Mitchell was found still conscious by police officers, was transported to the hospital, and died soon after from four gunshot wounds that penetrated his back and vital organs. (Tr. at 614-24.) Ballistics tests showed that the three recovered .38 caliber bullets were all fired from the same gun. (Tr. at 366, 369.)

3

## 2. The Investigation and Arrest

On March 6, 2001, Detective Joseph Litrenta arrested Jones and retrieved his mobile phone from the apartment he shared with Dewitt. (Tr. at 577-78, 595-97, 653.) Telephone company records showed calls between Johnson, Clemmons, Cruz, and Jones before and after the shooting. (Tr. at 509, 733-62.)

On January 10, 2003, Johnson was arrested in Charlotte, North Carolina. Johnson asked, "What's this all about?" Deputy Sheriff William Lowe informed him, "A murder out of New York." Johnson replied, "I wasn't the only one there." (Tr. at 516-17.) Detective Lowe also arrested Cruz in Charlotte. (Tr. at 517.) The next day, Detective Litrenta interviewed Johnson in Charlotte and administered Miranda warnings. (Tr. at 653-59, 672-81.) A four-hour interview resulted in a written statement.

Johnson's written statement had nine parts, each signed by him, Detective Litrenta, and Litrenta's partner. (Tr. at 660-66.) In the written statement, Johnson confirmed that he received a phone call from Clemmons about a problem that Jones was having. (Tr. at 660.) He stated that he had sent Clemmons upstairs to get a gun in Clemmons's girlfriend's house, and that the gun was passed to Johnson before they got into the cab. (Tr. at 660, 663.) Johnson explained that he took the gun from Clemmons "for safety," that he had "no intention of killing anyone," and that he "took [it] just in case someone wanted to be a cowboy and start shooting." (Tr. at 664.) Johnson confirmed that before leaving the building near the scene in search of Mitchell, he had passed the gun to Cruz. (Tr. at 665.) Johnson explained that Cruz told him to do so "because everyone knew [Johnson]" in the building. (Tr. at 665.)

On January 27, 2003, Johnson was charged with one count each of second-degree criminal facilitation and second-degree and third-degree criminal possession of a weapon. On

4

May 27, 2003, Dewitt and a man named Laquann Perkins identified Johnson in a line-up, but Dewitt recognized him only as being "from the projects," while Perkins identified him only as having been present when Mitchell was shot. (Tr. at 525-37, 547-50.)

On November 13, 2003, Clemmons signed a cooperation agreement following an indictment on unrelated narcotics charges. Pursuant to the terms of his cooperation agreement, Clemmons agreed to waive indictment and plead guilty to conspiracy in the second degree and criminal facilitation in the second degree for his role in the Mitchell murder. After new information came to light, Johnson was additionally charged with second-degree murder on November 14, 2003, and the charges were consolidated.

Cruz and Jones were each separately indicted for their roles in Mitchell's murder. Cruz was acquitted at trial. Jones pleaded guilty to a reduced charge of manslaughter in the first degree, and was sentenced to a prison term of thirteen and one-half years. Clemmons was sentenced to a prison term of one to three years, to be served concurrently with the prison sentence imposed for the separate narcotics indictment of three to six years.

### 3. Trial

Johnson's trial began on Tuesday, October 26, 2004. The People relied on Clemmons's testimony to establish Johnson's participation in Mitchell's murder in addition to Johnson's post-arrest written statements in which he admitted possession of the gun for self-defense, giving the weapon to Cruz, and standing next to Cruz when Mitchell was shot.

During cross-examination, the defense questioned Clemmons extensively about how he had avoided a murder-charge in his role in Mitchell's death, and his acceptance of a plea bargain which commuted his twenty-five to life sentence to eighteen months. (Tr. at 404.) Clemmons completed his testimony on the first day of trial. The trial continued through Thursday, October

28, 2004, after which the court excused the jury for a three-day weekend, with its final charge to be delivered the following Monday. (Tr. at 861-64.)

On Monday, November 1, 2004, before the jury was charged, defense counsel asked the court to re-open the evidence to call a witness to rebut Clemmons's testimony. (Tr. at 866-74.) Counsel explained that earlier that morning, Johnson had provided him with a notarized written statement from an inmate named William Doggett. (Tr. at 866.) In that statement, Doggett claimed that following trial on Tuesday, October 26, the day Clemmons testified, Doggett had been on the bus returning to Rikers Islands with Clemmons and Johnson. (Tr. at 866.) According to Doggett, Clemmons told him that he "had to lie" because "[if] he didn't lie, he'd go to jail for twenty-five years." (Tr. at 868.) Johnson told his attorney about the incident on the morning of Monday, November 1, and informed his attorney that, in addition to Doggett's notarized written statement, "two other inmates on the bus [were] willing to testify in like manner." (Tr. at 873.) Johnson had no explanation for his delay in notifying his attorney of Clemmons's alleged statement. (Tr. at 870.) The prosecutor opposed the motion on the ground that Johnson could have brought the matter to the attention of counsel and the court on October 27 and 28, while the prosecution was presenting its case. (Tr. at 869-72.) The court denied the motion on the ground that Johnson could not credibly have been aware of such a damaging admission by Clemmons without immediately bringing it to the attention of counsel. (Tr. at 873-74.) Counsel then "respectfully except[e]d and [p]reserv[ed] the issue on that point for purposes of appeal." (Tr. at 874.) The court responded that counsel had done so "admirably, timely and lucidly." (Tr. at 874.)

The jury deliberated and returned a verdict of guilty on all counts. (Tr. at 926-27.)

#### 4. Presentence Report and Sentencing

According to the presentence report, Johnson's prior criminal history consisted of: (a) a 1996 "juvenile delinquent" adjudication for criminal possession of a controlled substance in the fifth degree; (b) a 1998 arrest for disorderly conduct for which he received a conditional discharge; (c) a 2000 conviction trespass as a misdemeanor; and (d) a 2000 conviction for attempted criminal sale of a controlled substance in the third degree, for which he was sentenced to a prison term of four to twelve years following his return on the warrant in the instant case. (Mem. in Supp. of Pet. ("Pet'r's Mem.") at 10.) The report concluded that Johnson's "prognosis is unfavorable." *Id.* At sentencing, the court interpreted the presentence report to recommend that the court "finish him off" because he was "of no future value" (*Id.* at 11 (*citing* Sentencing Tr. at 20).)

On March 14, 2005, Johnson was sentenced to an aggregate prison term of thirty years to life, consisting of a prison term of twenty-five years to life for murder in the second degree charge, and a consecutive five-year term for criminal possession of a weapon in the second degree. He also received concurrent prison sentences of five to fifteen years for criminal facilitation in the second degree, and seven years for the criminal possession of a weapon in the third degree. A five-year term of post-release supervision was also imposed. He is presently incarcerated in Greenhaven Correctional Facility pursuant to that judgment.

### B.   Procedural Background

Johnson appealed his conviction, which was affirmed by the Appellate Division on February 26, 2008. *People v. Johnson, 48 A.D.3d 348* (1st Dept. 2008*).* On appeal, Johnson raised the same claims he raises in his Petition. The Appellate Division rejected both claims and unanimously affirmed the conviction. *Id.* at 348. The Appellate Division found that the trial

court properly exercised its discretion in denying Johnson's application, made after both parties' summations, to reopen the trial to allow testimony of an inmate concerning the chief prosecution witness's alleged admission that he had testified falsely. *Id.* In rejecting Johnson's first claim, the court found that there was no compelling reason to deviate from the normal order of proof because he had waited to notify his attorney about the incident until after summation, with no excuse for the delay. *Id.* Next, the court found that to the extent that Johnson raised a constitutional claim, such a claim was "unpreserved," and declined to review it "in the interest of justice." *Id.* In the alternative, the court rejected the constitutional claim on the merits, finding that "[s]ince defendant had the opportunity to introduce this evidence at the proper time and in the proper manner, there was no impairment of his right to present a defense." *Id.* In rejecting the second claim, the court summarily explained that it "perceive[d] no basis for reducing the sentence." *Id.* Leave to appeal to the New York Court of Appeals was denied on May 28, 2008. *People v. Johnson,* 2008 N.Y. LEXIS 1960 (N.Y. May 28, 2008).

## II.    DISCUSSION

### A. Threshold Issues

#### 1. Timeliness

A petitioner must file an application for writ of habeas corpus within one year of his conviction becoming final. *See* 28 U.S.C. § 2244(d)(1). A conviction becomes final "when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s]," that is, ninety days after the final determination by the state court. *Williams v. Artuz,* 237 F.3d 147, 150 (2d Cir. 2001) (*quoting Ross v. Artuz,* 150 F.3d 97, 98 (2d Cir. 1998)). Johnson's application for leave to appeal to the New York Court of Appeals was denied on May

28, 2008. Thus, his conviction became final on August 26, 2008. Because his Petition was filed on August 26, 2009, within one year of his conviction becoming final, it is therefore timely.

## 2. Exhaustion

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the Court may not grant a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b) (1)(A); *See Picard v. Conner*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). This requirement includes both substantive and procedural components. In order to satisfy substantive exhaustion, a petitioner's claim before the state courts must have been federal or constitutional in nature. Although not an exacting standard, a petitioner must inform the state courts of "'both the factual and the legal premises of the claim [he] asserts in federal court.'" *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (*quoting Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*)).

Procedurally, the petitioner must utilize all avenues of appellate review within the state court system before proceeding to federal court. *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994). He must raise a federal claim at each level of the state court system, "present[ing] the substance of his federal claims 'to the highest court of the pertinent state.'" *Id.* (*quoting Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)).

Johnson exhausted his first claim when he requested leave to appeal to the New York Court of Appeals. His first claim on the right to present a defense is federal or constitutional in nature. His second claim challenging his sentence terms, however, is unexhausted because he did not raise his constitutional challenges on direct appeal.

9

### 3. Procedural Bar

A claim is precluded from habeas review if (1) the state court declines to address petitioner's federal claim because petitioner failed to meet a state procedural requirement, and (2) the state court decision rested on an independent and adequate state ground. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Jones*, 126 F.3d at 414 (*citing Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994)); *Pearson v. Greiner*, 02 Civ.10244, 2004 WL 2453929, at *8 (S.D.N.Y. Nov. 3, 2004); *McLaurin v. Kelly*, No. 94-CV-1560, 1998 WL 146282, at *3 (N.D.N.Y. Mar. 27, 1998) (*quoting Lilly v. Gilmore*, 988 F.2d 783, 785 (7th Cir.), *cert. denied*, 510 U.S. 852 (1993)). A state law ground is "adequate" if "the state's insistence on compliance with its procedural rule serves a legitimate state interest." *Wainwright v. Sykes*, 433 U.S. 72, 83 n.8 (1977) (*quoting Henry v. Mississippi*, 379 U.S. 443, 447 (1965)). Further, the adequacy of a procedural rule rests on whether such rule is firmly established and regularly followed in the specific circumstances presented in the case. *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).

A petitioner can overcome this procedural bar if he shows both cause and prejudice, or fundamental miscarriage of justice. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (*citing Murray v. Currier*, 477 U.S. 478, 488 (1989)); *United States v. Frady*, 456 U.S. 152, 168 (1982); *Washington v. Superintendent, Otisville Cor. Facility*, No. 96 CIV. 2729, 1997 WL 178616, at *7 (S.D.N.Y. Apr. 11, 1997) (*citing McCleskey*, 499 U.S. at 495).

During trial, counsel "respectfully except[e]d and [p]reserv[ed] the issue on that point for purposes of appeal," and the trial judge remarked that counsel had done so "admirably, timely and lucidly." (Tr. at 874.) Nonetheless, the appellate court found Johnson's constitutional claim to be "unpreserved." *Johnson*, 48 A.D.3d at 348. The appellate court did not explain the basis for ruling that the claim was unpreserved, and there is no evidence that the Appellate Division's

finding was based on a firmly established and regularly followed state procedural rule. The Court finds that Johnson's first claim is not procedurally barred and will be analyzed on its merits.

## B. Merits of the Claims

### 1. Standard of Review

AEDPA constrains a federal habeas court's ability to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. It limits issuance of the writ to circumstances in which the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d) (1); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to federal law if the state court applies "a conclusion opposite to that reached by [the Supreme] Court on a question of law or if [it] decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. Only the holdings of the Supreme Court are pertinent in evaluating a habeas petition, not any interpretive gloss placed on them by the lower federal courts. *Carey v. Musladin*, 549 U.S. 70, 74-78 (2006).

Furthermore, in cases where the state court decision rests on a factual determination, the federal court must find that the "decision . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2). If the state court's decision cannot be viewed as objectively unreasonable, habeas relief is foreclosed, regardless of how this Court would resolve the matter in the first instance. *Brown v. Payton*, 544 U.S. 133, 147 (2005) (*citing Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

### 2. Johnson's Claim That He Was Unfairly Precluded From Calling a Supporting Witness

Johnson contends that he was deprived of a fair trial because he was denied the opportunity, after closing arguments and before the jury charge, to call a witness who claimed to have heard the chief prosecution witness admit to having testified falsely. Johnson argues that the court's "enunciat[ion] [of] disbelieve that Petitioner could not credibly have been aware of such a damaging admission by Clemmons without immediately bringing it to the attention of counsel, clearly did not constitute sufficient reason to summarily preclude such testimony. . . . Moreover, at the very least, before making the decision to refuse to allow Doggett's testimony, the court was required to have brought him in for an offer of proof so as so ascertain, outside the hearing of the jury, precisely what his testimony would have been." (Pet'r's Mem. at 14.) The State maintains that the evidence was properly excluded within the sound discretion of the trial judge, "[g]iven petitioner's unexcused failure to call Doggett in a timely manner." (Mem. of Law in Supp. of Answer Opposing Pet. ("Opp'n Mem.") at 25.)

The constitutional right to present a complete defense and confront accusers in a criminal trial is clearly established. *See, e.g., Taylor v. Illinois*, 484 U.S. 400, 409 (1988); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *United States v. Nixon*, 418 U.S. 683, 709 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Whether the exclusion of evidence violates the right to present a defense depends on whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112 (1976). Thus, where "the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113. The trial courts have broad discretion to keep proceedings within

12

...

manageable limits and to curtail collateral matters. *See Crane*, 476 U.S. at 689-90; *accord People v. Hudy*, 73 N.Y.2d 40, 56 (1988) (*citing People v Sorge*, 301 N.Y. 198 (1950)). "However, extrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground." *Hudy*, 73 N.Y.2d at 56.

Johnson cites a number of cases in which evidence addressing motive for fabrication of evidence was improperly excluded. *See, e.g., Justice v. Hoke*, 90 F.3d 43 (2d Cir. 1996); *Hudy*, 73 N.Y.2d 40; *People v. Szwec*, 271 A.D.2d 322 (1st Dept. 2000); *People v. Rios*, 223 A.D.2d 390 (1st Dept. 1996); *People v. Gaskin*, 170 A.D.2d 458 (2nd Dept. 1991). The facts in *Justice v. Hoke* are similar to those at hand, where testimony was excluded that would have substantiated the defense of fabrication against the chief prosecution witness. *Hoke*, 90 F.3d at 45. None of the cases that Johnson cites, however, concern the issue of the timeliness required when introducing corroborating evidence of motive for fabrication.

As with many rights, the right to present a defense is not unlimited. *See, e.g., Michigan v. Lucas*, 500 U.S. 145, 149 (1991); *Nix v. Whiteside*, 475 U.S. 157, 173 (1986); *Chambers*, 410 U.S. at 302. Respondent cites a number of cases to support the argument that deference is due to the state trial judge on the issue of submission of evidence, and will not be interfered with unless clearly abused. *See, e.g., Morris v. Slappy*, 461 U.S. 1, 14 n.5 (1983) (proper refusal to admit testimony after summations); *Ungar v. Sarafite*, 376 U.S. 575 (1964) (proper denial of continuance based upon party's arguable reliance on inclement weather); *United States v. Bayer*, 331 U.S. 532 (1947) (proper refusal to admit unsworn, unverified record four hours into jury deliberations); *United States v. Sheba Bracelets*, 248 F.2d 134 (2d Cir. 1957) (proper refusal to admit questionably necessary, unverified report while jury awaiting summations). None of the

cases cited, however, address the issue of late submission of alleged corroborating evidence of an informant's motive for fabrication.

The trial court's refusal to admit late testimony, however, was not "objectively unreasonable" in light of the evidence presented. *See Brown*, 544 U.S. 133 at 147. Counsel for Johnson extensively cross-examined the prosecution's main witness as to his acceptance of a plea bargain in exchange for his testimony. Moreover, as the trial judge noted, Johnson offered no reason to explain the late timing of the motion to submit. Whether or not the trial judge should have at least heard an offer of proof of the testimony, as Johnson argues, is irrelevant since the acceptance of the evidence itself was within his discretion. Because the Supreme Court has not ruled directly on the issue presented here, and the trial court's decision was not based on an unreasonable determination of the facts in light of the evidence presented, this claim lacks merit and should be **DENIED.**

### 3. Johnson's Claim That His Sentence is Unconstitutional

Johnson contends that his sentence was harsh, excessive, and severe, so as to constitute cruel and inhuman treatment in violation of the Eighth Amendment, and should be modified to run concurrently. Johnson argues that "nothing in the [presentence] report remotely suggested what the court deemed the report to recommend: that the court 'finish him off' as someone of 'no future value.'" (Pet'r's Mem at 16-17.) Johnson notes that he had no prior history of violence, and that his entire criminal history consisted of two drug convictions (one as a juvenile), a disorderly conduct charge resulting in a conditional discharge, and an instance of trespass as a misdemeanor. For those reasons, Johnson argues that a sentence totaling thirty years to life is cruel and inhumane treatment. Next, Johnson argues that a consecutive sentence for the second-

degree weapon possession charge is "technically unlawful . . . since the alleged intent related solely to the shooting itself and had no other object." *Id.* at 17.

The Second Circuit has held that "no federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381 (2d Cir. 1992). Moreover, "there is 'no constitutionally cognizable right to concurrent, rather than consecutive, sentences.'" *United States v. McLean*, 287 F.3d 127, 136-37 (2d Cir. 2002) (*citing United States v. White*, 240 F.3d 127, 135 (2d Cir. 2001)). "A petitioner must show the trial court's sentencing decision amounted to an improper, 'arbitrary or capricious abuse of discretion' that deprived the petitioner of his liberty." *Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001) (*quoting Jones v. Hollins*, 884 F. Supp. 758, 761-62 (W.D.N.Y.), *aff'd*, 89 F.3d 826 (2d Cir. 1995)). The imposition of consecutive sentences is found to run afoul of the Eighth Amendment "only under extraordinary circumstances." *Herrera v. Artuz*, 171 F. Supp. 2d at 151 (*citing Salcedo v. Artuz*, 107 F. Supp. 2d 405, 414 (S.D.N.Y. 2000)).

Here, Johnson, by his own admission, coordinated the attainment of the weapon to confront the victim over a drug-turf rivalry, possessed the weapon in the initial confrontation of the victim, and coordinated participation of the actors in the chain of events which ensued. The *mens rea* established by Clemmons's testimony only buttresses the body of evidence against Johnson. In light of the circumstances, the sentences imposed by the state court cannot be found to be "extraordinary." As discussed above, because Johnson failed to raise his federal claim with regard to his sentencing on appeal to the Appellate Division, the claim is unpreserved as a matter of law. Moreover, even if this Court were to rule directly on the merits, his claim would fail because the state court's decision was not an abuse of discretion. Accordingly, this claim is both unpreserved and lacks merit and should be **DENIED.**

### III. CONCLUSION

For the foregoing reasons, I recommend that Johnson's petition for a writ of habeas corpus be **DENIED**. Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Jed S. Rakoff, 500 Pearl Street, Room 1340, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F. 2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b) (1) (West Supp. 1995); Fed R. Civ. P. 72, 6(a), 6(d).

Dated: May 2, 2011
New York, New York

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge

Copies of this Report and Recommendation were sent to:

Attorneys for Petitioner
Stephen N. Dratch
Franzblau Dratch, P.C.
233 Broadway, Suite 2701
New York, New York 10179

Attorneys for Respondent
Karen Schlossberg
Martin J. Foncello (MF-2778)
One Hogan Place
New York, New York 10013